Good morning, your honors. May it please the court. Judge Schiavelli, in his assessment and adjudication of the motion for new trial, did not discharge his mandatory obligation under the law to balance and weigh the evidence and assess the key credibility of the witness at issue and at the cornerstone of the underlying motion, Dr. Affletoo. What kind of objection did you make to this expert's testifying at all and testifying as to particular matters? Your honor, at the beginning, or I should say prior to the commencement of Dr. Affletoon's testimony, and actually even before, we moved in limine on one level to bar Dr. Affletoon under Rule 26 for failing to provide a Rule 26 report. That earlier motion was denied without prejudice. We renewed our motion in limine before Dr. Affletoon took the stand, specifically requesting the court to limit the doctor to his opinions or deposition. The reason for that motion was Dr. Affletoon, two weeks before the trial, swore under oath he couldn't make a probable cause determination between the disc herniation and the March 1905 accident. Having so limited Dr. Affletoon to that testimony, we pushed forth knowing that any deviation from that ruling by Judge Schiavelli, who said he will be limited, would be a violation of his ruling, would be a violation of Rule 37. I would also indicate, Judge Fletcher, that during the course of the direct and redirect, I as the trial counsel personally moved to strike no less than three times under Rule 37, specifically when he was asked to opine on whether, quote, someone with a disc herniation could run a 10K race, when asked about Ms. Manfred's capability to run the race if she had had some pre-existing disc herniation. And I also moved to strike, and those two motions to strike on that were granted. I also objected and moved to strike when Ms. Manfred was asked about, or I'm sorry, when Dr. Affletoon was asked about whether or not a snow, she'd be able to snowboard before the accident if she had a pre-existing disc herniation. That was well beyond his testimony. Counsel, I thought there was evidence that the plaintiff's back problems before this event were not this herniated disc, but were other kinds of back problems, and that there was other evidence beyond Dr. Affletoon of causation, including the accident reconstructionist surgeon, et cetera. And ordinarily we ask for experts, but this person was basically smashed by a truck or a big van, and it's, I'm not even sure expert testimony is necessary. Let me address that, Your Honor. Expert testimony first, and as usual, that's an extremely perceptive observation by this Court, but let me explain. Expert medical testimony was absolutely required in this particular case. Well, that was somewhat flippant on my part, but wasn't the evidence of her pre-existing or prior back problems different back problems? That was really the first part of my question. What Your Honor is referring to, I believe, is pre-existing problems that were evidenced and documented by Dr. Maya Cora in 2004, and also six months before, I think it was six months before this accident. And here's what's central, and I'm glad you raised that issue, and is presented in the further excerpts of the record, I believe it's at 915. Dr. Cora undisputedly testified, that was their witness, undisputedly testified that she would not have submitted Ms. Manfred for the x-rays unless she suspected or strongly suspected a disc herniation. That's not my question, though. Was there any evidence that she actually had a herniated disc problem before this event with the van? Yes, Your Honor. According to Dr. Cora herself, was sent around for those x-rays. Well, people are sent out on suspicion of things all the time, and the suspicions are not borne out. That's why they do the tests. If they knew the answer, they wouldn't need the test. Was there evidence that the test, in fact, demonstrated that there was a herniation of the same disc before the van smashed her? She sent her out for the x-rays. There was no x-ray. It wouldn't show up on an x-ray, first of all. You'd have to go further with the MRI. But was there film documentation actually showing a bulged disc before? No. However, after this particular accident on development department, she didn't even note any back complaints from Ms. Manfred following the March 1905 accident. And it's also important to note that that, Your Honor, just framed a question which never was asked or answered of Dr. Aplatoon, and he couldn't have asked that question or answered it because he was never even reviewed Dr. Cora's medical records. Well, I guess we're sort of going round and round with the same thing, but if there's no evidence that she had the same problem earlier, then the failure to review the non-evidence of the non-problem doesn't really seem to get us anywhere. And I guess it just seems I don't understand the relevance of it even. Well, the relevance of it would be is that Dr. Cora clearly documented chronic back complaints, pain in the lower back, six months, at least six months before this accident, sent her out for those films. So you're saying it's against the clear weight of the evidence because she had some back aches before the time the van smacked her, and then the surgeon and nobody who says that the accident didn't cause the herniated disc? Dr. Triggs, defense expert Dr. Triggs testified definitively that based on his view of the video film, video surveillance, some, taken months, some months and weeks after the subject accident, showed activity that was completely inconsistent with someone who had herniated disc in the subject accident. That was never reviewed or commented upon by Dr. Appletine, their only sole medical expert. You mention accident Cora is now at risk for an argument to the jury. Does anyone deny that she currently or sometime after the accident had a herniated disc? I'm sorry, Your Honor? At some point after the accident, she had a herniated disc. Is that accurate? There's a film that documented a herniated disc. Okay. And the medical evidence and commentary on that was that she was an extremely physical person, although somewhat youthful, but because she engaged in so many different physical activities, jiu-jitsu, Well, this would be not that it wasn't caused by the accident, but that the disability wasn't as great as she claimed. Is that correct? Well, it really went to whether or not it was medically caused, not just whether or not she was as disabled. The countless activities that the video surveillance depicted this man for doing, whether it be getting in and out of cars, bending, stooping, doing activity. But that doesn't really relate to the causation. So I could see that it might relate to the amount of disability from the disc. But with respect, Your Honor, it does when you just don't, in your case in chief, have the video surveillance shown as we did. It went to the next level and was given to our medical expert, who is an experienced orthopedic surgeon of some 30 years and has seen thousands of patients and performed thousands of surgeries. And he sees this man for doing things after March 19, 1905, which are completely inconsistent within his experience, his orthopedic expertise, with someone who has suffered radiculopathy and damage to the disc at L-5 and L-4. Then it does become a matter, a central true causation. And your theory is that this disc happened after the accident? Our theory, Your Honor, is based on her lifestyle and experience, and based on the biomechanical testimony through Dr. Scheer that was also present. That's not an answer. She had a herniated disc and it was operated on. What is your theory of when it was herniated and why? Based on the record, according to the testimony of Dr. Scheer, which went unrefuted, there are activities of daily living that was proffered by Dr. Scheer that have an effect of microtrauma day in and day out on a disc, especially with someone as physical as Ms. Manford was, that that accumulate and cumulatively affect the disc on an everyday basis. It was not unusual for someone, he testified in her lifestyle, to have a disc like that in connection with her activities of daily living. But there was no medical evidence that was presented by the appellees, by the appellees, that this disc was traumatically induced. And centrally juxtaposed to that is what Ms. Manford was doing day in and day out, following that accident. So what Victor has seen is the traumatic inducement of the lumbar disc and the microtraumatically induced damage to the disc on an everyday basis that could have resulted in her condition. Well, where does all that get you now? Well, Your Honor, if you go to, there was a, on top of all that, Your Honor, there was no definitive statement by a medical expert on the opposing side to the effect of, and this would only have to be affluent, this accident was a probable cause of the disc herniation that occurred in the accident on March 19th, 05. What you had was, as evidenced at the record at page 115, and I was very careful about this as trial counsel. I know what he had testified to before the trial, and I asked him straight up, you would agree then, as you're sitting here today in this case, that you cannot state within a reasonable degree of medical probability that this accident caused the disc. Answer, correct. I'm sorry? Answer, correct. That was his testimony under Jennings v. Gallimore and the Brown v. Syntax case. You see, I think, are both instructive in terms of what the lower courts did with marginal expert evidence. In Jennings, that particular court got so detailed that it actually, yes? So you're saying there was really no evidence of causation, the herniations, because of this event? Precisely. It wasn't taking so long to say that. Right. Okay. And that this was a woman who was athletic, and just her daily routines, her athleticism, and the pounding on the disc, the lumbar area, her running, skiing, and whatever else she did, over time just causes herniation. Exactly. And that this truck, this van that ran into her and pinned her between the van and the pickup truck, that had nothing to do with the cause of the herniations. Not with the disc herniation, nor with the knee. What? Not with the disc herniation, nor with the knee, as the jury had found. The disc herniation we're obviously talking about, and that's because of the biomechanical issues involved, that that particular impact we presented, expert testimony, had no effect on the lumbar area. And I notice I'm running short of time. You're over time. Okay. But can I reserve short time? Well, you can't reserve what you don't have. You know, if you want to do that, you've got to become a banker. Thank you. Good morning, Your Honor. I'm Gary Williams. I represent Ms. Manford in this matter. I think that you might answer all of your questions by making reference to the record submitted by the defendant. At page 111 of the record, this comes from Volume 2, and this is Mr. Jaffe speaking to Dr. Aflatoon at the time of trial. And he says to him at line 22, quote, All right, so I'm just trying to understand this. You, he's referring to Dr. Aflatoon, come into court and you provided us with an opinion that the accident is the cause of Ms. Manford's disc herniation. Is that correct? And Dr. Aflatoon says, correct. On page 113, Mr. Jaffe asked the question at line 15, Sir, the question simply was, isn't it true as you sit here today under oath, without the benefit of the information that we've just, I've just referred to, you cannot formulate an opinion that the March 19, 2005 accident was the probable cause of the disc herniation. Is it true? Answer, that's not true. In addition, Mr. Jaffe omitted, I'm sure unintentionally, Dr. Aflatoon was deposed on two occasions. And in the record submitted by the defendant in this action, this is Volume 4, found at page 675 of that volume, quoting from Dr. Aflatoon's deposition taken for the first time, the question is asked, I'll abbreviate it, it's in the deposition at page 44, line 21. So it's your testimony that there's a reasonable degree of medical certainty that the accident caused Ms. Manford's condition. Answer, correct. What does that tell us? The doctor was deposed, not once but twice. He testified in deposition that, in his opinion, the accident caused her herniation. As the record has clearly shown, he was the treating surgeon. This is not a hired gun, as Dr. Triggs was. This was a man who performed two surgeries. Unfortunately for our client, she developed an infection, he had to go back in. And therefore, there were two surgeries. So he's, and I kept repeating this over and over in motions before the court, you know, he, Dr. Aflatoon, is sui generis. He's a treating doctor, and then we also declared him as an expert out of an excess of caution, and perhaps err on my part. But the fact of the matter is, Dr. Aflatoon did so state that, in his opinion, what these folks want to do on the defense is they want a third do-over. They put this before a jury, and they won half the case, by the way. That's in the record. Judge Chiavelli noted that their motion was not based on the need. The special verdict form, which I believe is part of the record, had two questions. The first question was whether or not the accident was a substantial factor in causing damage to Ms. Excuse me, I apologize. First question was whether the accident was a substantial factor in causing damage to Ms. Manfred's lumbar spine. The answer was yes. Second question was, was the accident caused by superstition a substantial factor in causing damage to Ms. Manfred's right knee? The answer was no. So we stand here before you. We lost half the case. They won half the case, but they're not satisfied with that. And what they want is not only to overturn the jury's verdict, which was based on, as you pointed out, Your Honor, other testimony, including the biomechanical engineer. There were two witnesses to the accident, three actually, although Mr. Greenrock was not called to testify. Dr. Cora came in and related that the problems that this young lady had on her back were related to such things as constipation and menstrual cycles. What these folks did was they went all the way back. In fact, it seems to be abandoned here today, at least in oral argument. They initially said that whatever problem she had was related to a snowboard accident that occurred, coincidentally, the day before the auto accident. These folks ended up at Mammoth Lakes enjoying the weekend, and Ms. Manfred was skiing, and she banged her knee. Snowboarding. Very active woman. The next day is when the 6,231-pound vehicle left in drive, not park, strikes her, and she's offloading the liftgate of her vehicle, hits her from behind with her son facing out toward her, young man standing to her right who stuck a guitar out to stop the vehicle out of an attempt, crushed the guitar. So three people saw the accident. The biomechanical engineers went out and they asked the reconstructionists. They reconstructed it. Mr. Brough testified that, in his opinion, the accident was consistent with the nature of the low back injury. And I'd like to address briefly the procedural aspects of the case. Mr. Jaffe is a very, very fine lawyer. He left no stone unturned in this case. He made a Dauber motion, which, as he indicated, was denied for procedural reasons. It was untimely, I think. He renewed the motion in limine before Dr. Aflatoon took the stand. But I would respectfully suggest that he himself opened the door to the testimony of which he now complains. It's a little bit like, be careful what you ask for. And that's the result. Now, once that door was opened and Dr. Aflatoon confirmed his deposition testimony, what was the procedural recourse available to Mr. Jaffe? I submit that as Dr. Aflatoon left the stand, there was an option at that point, and Judge Cervelli gave us an incredibly fair trial. He could have gotten up and said, I move to strike that testimony. Or I wanted admonition to this jury that they're not to disregard his testimony or limit his testimony, too. Didn't do that. We then submitted the special verdict form as it went to the jury. Could have made a motion. I jumped over. Could have made a motion perhaps at the end of the case once we rested. Motion for directed verdict at that point. Not done. Now we get down. Let's compare the special verdict form. First question. Was the accident a substantial factor in causing this benefit? Slumbar's fine. Approved by counsel. It went to the jury, and the jury found, if you will, 50% for us and 50% for them. And now they go in and ask for a new trial. And not being content with having gone back and basically saying, first of all, everything's related to the snowboard accident. Then moving forward and, in effect, attacking our client and the doctors who treated her, including Dr. Cora, exposing to our jury menstrual cycles, constipation, et cetera. We move on from that to a position where we hire a whole lot of very, very good people and pay an awful lot of money to come in and denounce our client in open court. And they were half successful. The jury did not buy the fact that she did have a knee surgery, and they didn't fine for us on that. So now we've had an untoward result, and what do we do? Rather than going forward and being fair and paying, we go on appeal. We ask the judge for an opinion. And what does the judge say? He says, and I believe the legal standard is, as Judge Cervelli said, indicated, new trial is going to be granted if the verdict is contrary to the clear weight of the evidence, it's clear the jury reached an erroneous result, or allowing the verdict to stand would result in miscarriage of justice, citing the Silver Sage case. And the footnote is, I think, educational to us because it says, because the defendant prevailed with regard to plaintiff's plain knee injury, the present motion only seeks a new trial with regard to plaintiff's back injury. They're going all in on this. And Judge Cervelli indicated the court found the defense's arguments unavailing because their argument only went to the weight. Now, if I had to do this again, if I got to do a do-over, I would sit down with Dr. Affletoon and I would woodshed him and say, look, review this stuff. But he didn't. You have those wonderful disks. They've been submitted. We submitted in our paperwork to the court a number of the records from Sunrise Hospital, which they did not do. That's before you. But I would have him do all of the above. So it does go to the weight of his evidence. Could he have done a better job? I think so. He could have reviewed more materials, but he simply didn't. It's in the record. This was the first time he ever testified in court. And I'm not here to apologize for him or my own conduct in the case. We did the best we could. The point is that I think a jury, a unanimous jury, sat and listened to all the sentiments and made a determination that Ms. Manfred's back injury and the two resultant surgeries and damages flowing therefrom were fair, right, and just, and they said we award that. But as to the knee, they didn't find our arguments, nor our doctor. There was another very well-renowned Beverly Hills surgeon who did everything we asked him to do, including reviewing the records and the disks and everything. The jury didn't accept that. The jury gave us nothing on that part of the case. So I think, in summary, one, if nothing else, with all due respect to Mr. Jaffe, he opened the door to the definitive magic words that he seems to believe is required, this mantra. This often reminds me of law school where we were taught the old English law that if you had no wit, you had no right. But Mr. Jaffe seems to be saying is unless there's these magic words in tone, you can't prevail. What law school did you learn that from? Actually, Your Honor, I learned that at the former Valley State College, now known as Cal State University in Northridge, where I told the United States Army in 1971 that I was going to return to school for an early out to further my education in the law. And there was a bit of a head fake on that. And in the course called History of the Anglo-American Legal System, one of our professors said in the old days, if you had no writ, you had no right. So if you didn't have a certain kind of document, you could not pursue a claim. But I'm just intoning that, not because I'm an ideologue or anything, but my point is that Mr. Jaffe seems to indicate that these magic words have to be used. If that's the case, Dr. Affleton intoned those magic words. Secondly, he did everything in his power to protect his record, and he did an able job of that. Judge Shigali got me, and it's in the record. He basically said, in effect, you better not have him testify beyond what he said in his deposition. And I said, okay. And I reviewed this record last night, and I don't think I asked that magic question. Doctor, can you state to a reasonable medical certainty that the accident caused this latent injury? I don't think I asked it. Thankfully, Mr. Jaffe did. And then I think there were a number of procedural vehicles that were available to Mr. Jaffe, which for his own technical reasons he chose not to take, striking the testimony, directed verdict, and so on. And apart from all that, if you're sitting there as a jury, a juror, you're told that a 6,200-pound 15-passenger vehicle has run into this lady who's 5'2 and weighs 110 pounds. She had been out running the day this incident occurred, in the morning. Mr. Martin testified to that. And then after that, her life sort of spirals downward. There was an exam done by an MRI after the fact in response to one of your inquiries, Justice. Judge, I'm told there's no justice in the Ninth Circuit. Anyway, an MRI was done after the accident. And it came up, Dr. Barrett did it, and it came up with a 6 by 8 by 10 millimeter bulge. That's the only evidence ever any MRI was done after the accident. This young lady was involved in, it's in the record, 10Ks and all kinds of stuff before this accident happened. And after, she simply couldn't do it. And I think that was compelling to the jury. And I've got extra time here. Why don't you leave it to your partner? I think I'll do that. Yeah. Senior partner, my old friend, said when you're here on points, sit down and shut up. Both of you need each other. Thank you, Your Honors. Aren't you going to thank your esteemed colleague? Thank you, counsel. Your Honors, the question, indeed, was never asked, as indicated by Appellee's counsel. The question he calls the magical words, it's not a matter of magical words. It's their burden. Causation is their burden. It must be established by preponderance of the evidence, and neither through the words or the conclusion was a probable cause connection made by the appellees in the underlying case between the accident and the herniated disc. And most compelling but tied to was a complete absence of any medical predicate that you would corollarily juxtapose with the conclusion of probable cause as to why, in his opinion, Dr. Appleton's medical opinion, their sole expert, the disc herniation was caused by this accident, as opposed to the microtraumatic impact of activities of daily living that was attested to by Dr. Shearer. I was probably having this big band, you know. Well, and that's where, Your Honor, that's where Judge Graber asked early on about accident reconstructionists and different experts. That's why we presented, and they had one, too, but he didn't refute the testimony. Dr. Shearer explained and articulated to the jury how biomechanically this accident is seemingly adverse as they might think. From a common experience point of view, from a biomechanical point of view, it did not relate to the disc herniation. In other words, the forces were not consistent with a disc being herniated, and he presented that testimony and predicated it on studies and charts and load factors, and that testimony was juxtaposed with our medical experts' testimony, who had reviewed the video surveillance, who attested to the fact that the activities of Ms. Manford following the accident were inconsistent with having suffered a herniated disc, and juxtaposed against their own doctor, Cora's testimony, that there were chronic back complaints preceding this accident and the snowboarding injury the day before. There was no ‑‑ Why don't you finish up, because you used up all the time. I would just say, Your Honor, before one of Judge Fletcher's questions, I was about to say that Brown v. Syntax and Jennings are quite instructive as to how the trial judge must balance and weigh on a motion for a new trial, which was not done here. I thank you for your time. Thank you very much. All cases for today are submitted, and we'll recess until 9.30 tomorrow morning. All rise. Thank you.
judges: Fletcher B. , Pregerson, Graber